**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| UNITED STATES OF AMERICA, <br> STATE OF CALIFORNIA, <br> STATE OF COLORADO, <br> STATE OF CONNECTICUT, <br> DISTRICT OF COLUMBIA, <br> STATE OF DELAWARE, <br> STATE OF FLORIDA, <br> STATE OF GEORGIA, <br> STATE OF HAWAII, <br> STATE OF ILLINOIS, <br> STATE OF INDIANA, <br> STATE OF IOWA, <br> STATE OF LOUISIANA, <br> STATE OF MARYLAND, <br> COMMONWEALTH OF MASSACHUSETTS, <br> STATE OF MICHIGAN, <br> STATE OF MINNESOTA, <br> STATE OF MONTANA, <br> STATE OF NEVADA, <br> STATE OF NEW JERSEY, <br> STATE OF NEW MEXICO, <br> STATE OF NEW YORK, <br> STATE OF NORTH CAROLINA, <br> STATE OF OKLAHOMA, <br> STATE OF RHODE ISLAND, <br> STATE OF TENNESEE, <br> STATE OF TEXAS, <br> COMMONWEALTH OF VIRGINIA, <br> STATE OF WASHINGTON, <br> STATE OF WISCONSIN, <br> *ex rel.* [UNDER SEAL], <br><br>         Plaintiffs, <br><br>     v. <br><br> [UNDER SEAL] <br><br>         Defendants. | Civil Action No. 15-_____ (   ) <br><br><br> Hon. _____, U.S.D.J. <br><br><br> **QUI TAM COMPLAINT** <br> **FILED UNDER SEAL** <br> **PURSUANT TO** <br> **31 U.S.C. § 3730(b)(2)** |

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>STATE OF CALIFORNIA,<br>STATE OF COLORADO,<br>STATE OF CONNECTICUT,<br>DISTRICT OF COLUMBIA,<br>STATE OF DELAWARE,<br>STATE OF FLORIDA,<br>STATE OF GEORGIA,<br>STATE OF HAWAII,<br>STATE OF ILLINOIS,<br>STATE OF INDIANA,<br>STATE OF IOWA,<br>STATE OF LOUISIANA,<br>STATE OF MARYLAND,<br>COMMONWEALTH OF MASSACHUSETTS,<br>STATE OF MICHIGAN,<br>STATE OF MINNESOTA,<br>STATE OF MONTANA,<br>STATE OF NEVADA,<br>STATE OF NEW JERSEY,<br>STATE OF NEW MEXICO,<br>STATE OF NEW YORK,<br>STATE OF NORTH CAROLINA,<br>STATE OF OKLAHOMA,<br>STATE OF RHODE ISLAND,<br>STATE OF TENNESEE,<br>STATE OF TEXAS,<br>COMMONWEALTH OF VIRGINIA,<br>STATE OF WASHINGTON,<br>STATE OF WISCONSIN,<br> *ex rel.* MICHAEL LAFAUCI,<br><br>              Plaintiffs,<br><br>     v.<br><br>ABBVIE INC. and QUINTILES<br>TRANSNATIONAL HOLDINGS INC.<br><br>           Defendants. | Civil Action No. 15-_____ (    )<br><br>Hon. _____, U.S.D.J.<br><br><br>**QUI TAM COMPLAINT**<br>**FILED UNDER SEAL**<br>**PURSUANT TO**<br>**31 U.S.C. § 3730(b)(2)** |

**SEALED QUI TAM COMPLAINT – Page 1 of 87**

On behalf of the United States of America, and on behalf of the above-named plaintiff States and the District of Columbia (the "*Qui Tam States*"), Plaintiff and Relator Michael Lafauci ("Lafauci" or "Relator") files this *qui tam* Complaint against Defendants AbbVie Inc. ("AbbVie") and Quintiles Transnational Holdings Inc. ("Quintiles") (collectively, "Defendants") and alleges as follows:

## I.     INTRODUCTION

### A.     Federal Law Claims

1.     This is an action to recover treble damages and civil penalties on behalf of the United States of America ("United States" or the "Government") in connection with an unlawful kickback scheme to induce and reward the writing of prescriptions for the injectable brand-name pharmaceutical Humira®, and to provide free goods and services to Humira® prescribers and patients, in violation of the federal Anti-Kickback Act, 42 U.S.C. §1320-7b(b) (the "AKA") and the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* (the "FCA").

2.     Pursuant to the FCA, Relator seeks to recover, on behalf of the United States of America, damages and civil penalties arising from false or fraudulent claims for reimbursement of Humira® prescriptions that Defendant submitted or caused to be submitted to Federal Government funded health insurance programs, including Medicare, Medicaid and TriCare.

### B.     State Law Claims

3.     This is also an action to recover double and treble damages and civil penalties on behalf of the names plaintiff States and the District of Columbia ("States") arising from the conduct of Defendant which:  (a) made, used or presented, or caused to be made, used or presented, certain false or fraudulent statements, records and/or claims for payment or approval to the States; and/or (b) made, used or caused to be made or used false records or statements to

conceal, avoid, or decrease an obligation to pay or transmit money to the States, all in violation of the States' respective False Claims Acts or equivalent statutes. The false or fraudulent claims, statements and records at issue involve payments made by health insurance programs funded by the States, including Medicaid.

## II. SUMMARY OF THE ALLEGATIONS

4.      AbbVie, a major U.S. pharmaceutical company that until January 2013 was part of Abbott Laboratories, manufactures, markets and distributes Humira®, an injectable biologic pharmaceutical which is indicated to treat a variety of autoimmune disorders. Humira is a hugely expensive drug, with treatments costing thousands of dollars per month, and is also hugely profitable for AbbVie, grossing over $12 billion in annual U.S. sales, accounting for well over 60% of the company's annual revenue. However, it will lose patent protection and exclusivity in 2016, an event that AbbVie has long feared would severely harm its bottom line and its stock price.

5.      Quintiles is a major U.S. pharmaceutical services outsourcing company. It primarily provides product development, financial assistance and commercial services to assist pharmaceutical companies develop, manufacture and market drugs.

6.      Since in or about early 2012, AbbVie (originally as Abbott) has partnered with Quintiles to develop and implement an aggressive nationwide marketing strategy to bolster Humira's volume and market share, protect it from encroachment by competitors and "bio-similars" such as Amgen Inc.'s Enbrel®, and to maximize revenues and profits before the product's patent expires. As Defendants' high-level executives well know, their marketing scheme, in short, constitutes an illegal kickback to both patients and their doctors in exchange for

generating and continuing Humira prescriptions, and thus violative of the Federal and State False Claims Acts.

7.     Defendants' strategy revolves around the creation of a virtual army of nurses (grandly dubbed "Nurse Ambassadors" or "Humira Ambassadors") who are assigned to make free "house-call" visits to any and all patients prescribed Humira, including those whose prescriptions are reimbursed by Federal and State programs. Ostensibly these visits are medically appropriate, arranged primarily to make sure patients know how to self-inject Humira. However, the nurses provide patients with a wide variety of valuable services, both health-care related and otherwise (for example, assisting patients with their health-care insurance). The nurses also provide patients with valuable free goods such as "travel packs" (Humira must be refrigerated), sharps containers, and other items.

8.     Defendants place *no limit* on patients' access to these free Nurse Ambassadors. To the contrary, they encourage nurses to interact constantly with "their" patients (nurses are typically assigned to specific patients), both by phone or other communication device, and particularly in person, both at the patient's home or sometimes at their doctor's office. The Nurse Ambassadors are instructed to create "compliance plans" for patients with the primary intent of making sure the patients continue taking Humira and do not switch to another treatment regimen. Many patients have daily scheduled "encounters" with their nurses, and can receive their free services for years. (Humira treats, but does not cure, the chronic autoimmune conditions for which it is prescribed, so potentially a patient could be on the drug for the rest of his or her life).

9.     Defendants also use the Ambassador Program as a powerful tool to access doctors and other prescribers (particularly those who have previously refused or resisted the efforts of

AbbVie sales reps to pay them detailing visits to promote Humira). As they do with patients, Defendants present the Ambassador Program to prescribers as providing a number of valuable services, which assume many burdens otherwise carried by the doctors and their staffs, as well as free goods, with the express (and unlawful) intent of incentivizing and rewarding them for prescribing Humira.

10.     Tellingly, the Nurse Ambassadors are paid far in excess of market nursing salaries, and also can receive tens of thousands in bonuses tied directly to their success in generating and maintaining Humira prescriptions. Similarly, AbbVie managers and executives with responsibility over the program have significant financial incentives tied to meeting or exceeding prescription and market-share quotas.

11.     Notwithstanding its supercompetitive, prescription-based compensation of those employees participating in the Ambassador Program, and the unlimited access to nurses the Program provides to patients, AbbVie's return on investment (which it tracks assiduously and precisely) is substantial. As one executive admitted, if a nurse keeps only a few patients on Humira, she pays for herself in multiples because the drug is so expensive and profitable.

12.     Accordingly, Defendants have grown AbbVie's Nurse Ambassador Program by leaps and bounds. One manager reported that in the two years since she initiated the program in her sales region, the number of nurses grew from two to well over 100. Yet despite the Program's tremendous success and impact on the bottom line, Defendants (particularly AbbVie) have kept the scheme quiet, because executives realize that it is unlawful and could attract the attention of the authorities. Nor have Defendants (to Relator's knowledge) sought the approval of FDA or other regulators. Defendants therefore have not publicly credited the Program (to investors, most notably) despite the financial success it has generated.

13.     Defendants' unlawful scheme has caused the Federal and State governments to pay billions of dollars for Humira claims that were ineligible for reimbursement.

## III. JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction over this action pursuant to 31 U.S.C. § 3732(a), 28 U.S.C. § 1331 and 28 U.S.C. § 1345. This Court has original jurisdiction of the State law claims pursuant to 31 U.S.C. § 3732(b) because this action is brought under State laws for the recovery of funds paid by the *qui tam* States, and arises from the same transaction or occurrence brought on behalf of the United States under 31 U.S.C. § 3730.

15.     This Court has personal jurisdiction over the Defendants because, *inter alia*, they transact business in this District and engaged in wrongdoing in this District. Abbott Laboratories, AbbVie's predecessor company, maintains offices in this District, and Defendant Quintiles maintains an office in this District.

16.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1391(b) and (c), because Defendants transact business within this District and engaged in wrongdoing in this District.

## IV. PARTIES

17.     Relator Michael Lafauci is a licensed New York pharmacist and independent businessman. He has worked as a pharmacist, adjunct professor of pharmacy (at St. John's University, one of the nation's premier pharmacy schools) and as a pharmaceutical sales representative. He resides at 22 Blackberry Lane, Center Moriches, New York.

18.     Relator is an original source of the allegations in this Complaint, and these allegations are not based upon publicly disclosed information. In conjunction with the filing of

this Complaint, he provided the Government with written disclosure of substantially all material evidence and information that he possessed, in accordance with 31 U.S.C. § 3730(b)(2).

19.     AbbVie Inc. is a major pharmaceutical company headquartered at 1 North Waukegan Road, North Chicago, Illinois. Until January 1, 2013 AbbVie was part of Abbott Laboratories.

20.     AbbVie is a publicly traded U.S. corporation (NYSE: ABBV) with a market capitalization of approximately $100 billion.

21.     AbbVie manufactures, markets and distributes a variety of biologic pharmaceuticals. Its biggest-selling product is Humira®, an injectable biologic.

22.     Quintiles Transnational Holdings Inc., which does business as Quintiles, is the largest pharmaceutical services outsourcing company in the U.S., headquartered at 4820 Emperor Boulevard, Durham, North Carolina.

23.     Quintiles also maintains offices at 10 Waterview Boulevard, #100, Parsippany, New Jersey, as well as in Colorado, Massachusetts, Ohio, New York, Texas, Indiana, Georgia, Kansas, Maryland, and California.

24.     Quintiles primarily provides product development, financial assistance and commercial services to assist pharmaceutical companies develop, manufacture and market drugs.

## V.  GOVERNING LAWS, REGULATIONS AND CODES OF CONDUCT

### A.      The False Claims Act.

25.     Originally enacted in 1863, the FCA was substantially amended in 1986 by the False Claims Amendments Act. The 1986 amendments enhanced the Government's ability to recover losses sustained as a result of fraud against the United States. Further clarifying amendments were adopted in May 2009.

26. The FCA imposes liability upon any person who "knowingly presents, or causes to be presented [to the Government] a false or fraudulent claim for payment or approval"; or "knowingly makes, uses or causes to be made or used, a false record or statement material to a false or fraudulent claim"; or "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(A), (B), and (G). Any person found to have violated these provisions is liable for a civil penalty of up to $11,000 for each such false or fraudulent claim, plus three times the amount of the damages sustained by the Government.

27. Significantly, the FCA imposes liability where the conduct is merely "in reckless disregard of the truth or falsity of the information" and further clarifies that "no proof of specific intent to defraud is required." 31 U.S.C. § 3729(b)(1).

28. The FCA also broadly defines a "claim" as one that "includes any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(b)(2)(A).

29. The FCA empowers private persons having information regarding a false or fraudulent claim against the Government to bring an action on behalf of the Government and to share in any recovery. The complaint must be filed under seal without service on any Defendant. The complaint remains under seal while the Government conducts an investigation of the

allegations in the complaint and determines whether to intervene in the action. 31 U.S.C. §
3730(b).

30.     In this action, the Defendants violated and/or failed to comply with anti- kickback
statutes and regulations material to the qualification of their services for federal and state
reimbursement.

## B.     Federal Government-Funded Health Assistance Programs.

### 1.     Medicare.

#### a.     Generally.

31.     Medicare is a federal government-funded medical assistance program, primarily
benefiting the elderly, that was created in 1965 when Congress enacted Title XVIII of the Social
Security Act, 42 U.S.C. §§ 1395 *et seq.* Medicare is administered by the federal Centers for
Medicare and Medicaid Services ("CMS"), which is a division of the U.S. Department of Health
and Human Services ("HHS").

#### b.     Medicaid.

32.     The Medicaid program was created in 1965 when Congress enacted Title XIX of
the Social Security Act to expand the nation's medical assistance program to cover the medically
needy aged, the blind, the disabled, and needy families with dependent children. 42 U.S.C. §§
1396-1396v. The Medicaid program is funded by both federal and state monies, (collectively
referred to as "Medicaid Funds"), with the federal contribution computed separately for each
state. 42 U.S.C. §§ 1396b; 1396d(b). At the federal level, Medicaid is administered by CMS.
Medicaid is used by 49 states, each of which has a state Medicaid agency to administer the
program. Each state is permitted, within certain parameters, to design its own medical assistance
plan, subject to approval by the HHS.

### c. General Provisions Applicable to Both Medicare and Medicaid. Prohibitions Against Claims for Services that are Not Medically Necessary or are Otherwise False or Fraudulent.

33.     Federal law prohibits a person from knowingly presenting or causing to be presented to Medicare or Medicaid a claim for a medical or other item or service that the person knows or should know was "not provided as claimed," a claim for such items or services that is "false or fraudulent," or a claim that is "for a pattern of medical or other items or services that [the] person knows or should know are not medically necessary." 42 U.S.C. §§ 1320a-7a(a)(1)(A), (B) & (E). Violation of this section is subject to a civil monetary penalty of $10,000 for each item or service, plus damages measured as three times the amount of each claim submitted, and exclusion from further participation in the programs.

### d. The Anti-Kickback Statute.

34.     Parties who contract or subcontract with the federal government are subject to the provisions of the Anti-Kickback Statute. That law renders it impermissible for any person "to provide, attempt to provide, or offer to provide any kickback," and defines 'kickback' to mean "any money, fee, commission, credit, gift, gratuity, *thing of value*, or compensation of any kind which is provided, directly or indirectly, to any prime contractor, prime contractor employee, subcontractor, or subcontractor employee *for the purpose of improperly obtaining or rewarding favorable treatment* in connection with a prime contract or in connection with a subcontract relating to a prime contract." 41 U.S.C. §§ 52-53 (emphasis added). This broad language reflects Congress's intent to prohibit even *attempts* to offer or provide a kickback, and to include a wide array of benefits and activities within its scope.

35.     The AKS prohibits kickbacks by providing a civil monetary penalty of $50,000 for each act by an individual or entity that violates 42 U.S.C. § 1320a-7a(a)(7), which

defines "[i]mproperly filed claims" as "[a]ny person (including an organization, agency, or other

entity . . . that commits an act described in paragraph (1) or (2) of section 1320a-7b(b) of this

title." The statute defines "illegal remuneration" (*i.e.*, kickbacks) as:

> (1)        whoever knowingly and willfully *solicits or receives* any remuneration
> (including any kickback, bribe, or rebate) directly or indirectly, overtly or
> covertly, in cash or in kind –
>
> * * *
>
>> (B)        in return for purchasing, leasing, ordering, or arranging for or
>> recommending purchasing, leasing, or ordering any good, facility, service,
>> or item for which payment may be made in whole or in part under a
>> Federal health care program,
>>
>> * * *
>
> (2)        whoever knowingly and willfully *offers or pays* any remuneration
> (including any kickback, bribe, or rebate) directly or indirectly, overtly or
> covertly, in cash or in kind to any person to induce such person –
>
> * * *
>
>> (B)        to purchase, lease, order, or arrange for or recommend
>> purchasing, leasing, or ordering any good, facility, service, or item for
>> which payment may be made in whole or in part under a Federal health
>> care program, 42 U.S.C. § 1320a-7b(b) (emphasis added). The offense is
>> also a felony punishable by fines of up to $25,000 and imprisonment for
>> up to five years.  42 U.S.C. § 1320a-7b(b).

36.        In accordance with the AKS, Medicare and Medicaid regulations directly prohibit

any provider from receiving remuneration paid with the intent to induce or reward the writing of

prescriptions that take into account the "volume or value" of any prescriptions or business

generated. *See* 42 C.F.R. § 1001.952(f). Such remuneration amounts to a kickback and can

increase the expenditures paid by Government-funded health benefit programs by leading to

overutilization of medicines and inducing medically unnecessary and excessive reimbursements.

Kickbacks also effectively reduce patients' healthcare choices, because unscrupulous (or

unknowing) physicians steer their patients to various providers and procedures based on the

physician's own financial interests rather than the patients' medical needs.

37.    The Office of Inspector General of the U.S. Department of Health & Human

Services ("OIG"), which has investigative and enforcement authority over health care fraud

affecting Federal programs, has issued guidance to pharmaceutical manufacturers warning them

that the provision of any things of value (including free services) to prescribers can violate the

AKS:

> Although liability under the anti-kickback statute ultimately turns on a party's
> intent, it is possible to identify arrangements or practices that may present a
> significant potential for abuse. Initially, a manufacturer should identify any
> remunerative relationship between itself (or its representatives) and persons or
> entities in a position to generate federal health care business for the manufacturer
> directly or indirectly. Persons or entities in a position to generate federal health
> care business include, for example, purchasers, benefit managers, formulary
> committee members, group purchasing organizations (GPOs), physicians and
> certain allied health care professionals, and pharmacists. The next step is to
> determine whether any one purpose of the remuneration may be to induce or
> reward the referral or recommendation of business payable in whole or in part by
> a federal health care program. Importantly, a lawful purpose will not legitimize a
> payment that also has an unlawful purpose.

OIG Compliance Program Guidance for Pharmaceutical Manufacturers, 68 Fed. Reg. 23731

(May 5, 2003) p.14.

38.    OIG specifically warned manufacturers that providing "product support services"

to prescribers or purchasers could raise AKS concerns:

> *Product Support Services*. Pharmaceutical manufacturers sometimes offer
> purchasers certain support services in connection with the sale of their products.
> These services may include billing assistance tailored to the purchased products,
> reimbursement consultation, and other programs specifically tied to support of the
> purchased product. Standing alone, services that have no substantial independent
> value to the purchaser may not implicate the anti-kickback statute. However, if a
> manufacturer provides a service having no independent value (such as limited
> reimbursement support services in connection with its own products) in tandem
> with another service or program that confers a benefit on a referring provider
> (such as a reimbursement guarantee that eliminates normal financial risks), the
> arrangement would raise kickback concerns.

*Id.* pp. 19-20.

39.     Similarly, OIG warned that providing "free or reduced-price goods or services" to prescribers or purchasers can implicate the AKS (*id.* at 22); further, it specifically noted that drug companies could not provide "services . . . [that] eliminate an expense that a physician would have otherwise occurred" if *one* (not the only or primary) purpose of the provision of services was to induce or reward the writing of prescriptions, even if there is also a "legitimate purpose for [the] arrangement":

> Any time a pharmaceutical manufacturer provides anything of value to a physician who might prescribe the manufacturer's product, the manufacturer should examine whether it is providing a valuable tangible benefit to the physician with the intent to induce or reward referrals. For example, if goods or services provided by the manufacturer eliminate an expense that the physician would have otherwise incurred (i.e., have independent value to the physician), or if items or services are sold to a physician at less than their fair market value, the arrangement may be problematic if the arrangement is tied directly or indirectly to the generation of federal health care program business for the manufacturer. Moreover, under the anti-kickback statute, neither a legitimate purpose for an arrangement (e.g., physician education), nor a fair market value payment, will necessarily protect remuneration if there is also an illegal purpose (i.e., the purposeful inducement of business).

*Id.* pp. 28-29.

40.     OIG also warned manufacturers that the identity and compensation of employees with marketing and sales responsibilities can also implicate the AKS. Among other things, it considers questionable the use of "'white coat' marketers or [persons] otherwise in a position of exceptional influence" over prescribers. Further, providing such persons with "extraordinary incentive bonuses" is also considered a red flag:

> Manufacturers should be aware that a compensation arrangement with a sales agent that fits in a safe harbor can still be evidence of a manufacturer's improper intent when evaluating the legality of the manufacturer's relationships with persons in a position to influence business for the manufacturer. For example, if a manufacturer provides sales employees with extraordinary incentive bonuses and

expense accounts, there may well be an inference to be drawn that the
manufacturer intentionally motivated the sales force to induce sales through lavish
entertainment or other remuneration.

*Id.* p. 37.

41.     OIG has also provided guidance letters to health care providers opining that,

where the provision of free services is linked directly or indirectly to patient referrals, and

relieves a provider of the cost and burden of those services, there is a "strong inference" that the

arrangement constitutes an illegal kickback, even where the services are related to appropriate

patient care. "The OIG's position on the provision of free or below-market goods or services to

actual or potential referral sources is longstanding and clear: such arrangements are suspect and

may violate the anti-kickback statute, depending on the circumstances." OIG Advisory Opinion

08-06 (May 9, 2008) at 4.

42.     For example, OIG disapproved of a diagnostic lab's providing free labeling of

specimen containers at dialysis facilities. Providing these free services constitutes a "tangible

benefit" to the facilities: "the receipt of free labeling services for which they would otherwise be

obligated to incur costs. In these circumstances, an inference arises that the free labeling

services are intended to influence the selected Dialysis Facilities' choice of a laboratory." *Id.* at

5.

43.     Similarly, OIG viewed a diagnostic lab's providing free chart review and

"infection control services" to nursing homes as "highly suspect":

> The provision of services that the recipient would otherwise be obligated to
> provide for free or at less than fair market value confers a benefit on the recipient.
> This benefit may constitute prohibited remuneration under the anti-kickback
> statute if one purpose of the remuneration is to secure referrals of Federal
> program business. Under the circumstances described in your letter, a strong
> inference is that the clinical laboratories are being asked to provide the free chart

review and infection control services in exchange for referrals of the nursing homes' laboratory business, including services payable in whole or in part by a Federal program. We would view such arrangements as highly suspect.

Advisory Opinion Letter, Kevin G. McAnaney, Chief, OIG Industry Guidance Branch (Oct. 2, 1997).

44.     OIG also disapproved of hospitals restocking ambulances bringing patients to the

emergency room with free medical supplies and medications, even though the program was

limited to replacing those supplies and medications used by the ambulance crew in transporting

the particular patient on that day:

> The Hospitals' proposed provision of free supplies and medications to the municipal ambulance services fits squarely within the meaning of remuneration for purposes of the anti-kickback statute. An inference may be drawn that at least one purpose of this remuneration may be to induce the ambulance services to bring patients to the Hospitals. To the extent those patients include beneficiaries of Federal health care programs who require covered hospital services, the anti-kickback statute may be implicated.

OIG Advisory Opinion 97-06 (October 8, 1997) at 3.

45.     OIG rejected the hospitals' argument that the restocking was directly related to

the patients' emergency medical care, and would not increase the amount of Federal

reimbursement the hospitals would receive:

> [I]ncreased cost to the programs is not the only criteria used in determining whether a particular business arrangement is abusive. *See, e.g.*, 56 Fed. Reg. 35952, 35954 (July 29, 1991). Others include preventing overutilization of health care items and services, ensuring quality of care for Federal program beneficiaries, preserving patient freedom of choice, and safeguarding fair competition in the health care marketplace. The Proposed Arrangement poses a risk of improper steering of patients and unfair competition. . . . Patients in need of ambulance services are often in a vulnerable state, and their choice of emergency room may be influenced by ambulance service personnel. In

> these circumstances, where the payments relate directly to the delivery of
> patients, remuneration paid by a hospital to an ambulance service,
> including the provision of free goods, would be highly suspect.

*Id.*

46.     The AKS contains statutory exceptions and regulatory "safe harbors" excluding
certain types of conduct from liability. *See* 42 U.S.C. § 1320a-7b(b)(3) and 42
C.F.R. § 1001.952. None of these statutory exceptions or regulatory safe harbors applies to
Defendants' conduct in this matter.

47.     The Medicare and Medicaid Patient and Program Protection Act of 1987
authorizes the exclusion of an individual or entity from participation in the Medicare and
Medicaid programs if it is determined that the party has violated the AKS. In addition, the
Balanced Budget Act of 1997 amended that Act to impose administrative civil monetary
penalties for AKS violations: $50,000 for each act and an assessment of not more than three
times the amount of remuneration offered, paid, solicited or received, without regard to whether
a portion of such remuneration was offered, paid, solicited or received for a lawful purpose. *See*
42 U.S.C. § 1320a-7a(a)(7).

48.     The Government has deemed such misconduct to be material to its decision to pay
healthcare claims, in part through its requirement that providers certify compliance with this law
as a condition of payment under, and participation in, Government healthcare programs.

49.     For example, all Medicare providers must prepare and submit to CMS a Medicare
Enrollment Application (CMS-855) which, among other things, includes a certification that the
provider is and will remain in compliance with all Medicare "laws, regulations, and program

instructions (including, but not limited to, the Federal anti- kickback statute and the Stark law), and on the [provider]'s compliance with all conditions of participation in Medicare."

50.     AbbVie submitted such certifications to the Government to become eligible for Medicare reimbursement and to maintain its eligibility.

51.     Because the Nurse Ambassador Program constituted an unlawful kickback to prescribing doctors and/or to patients receiving goods and/or services through the Program, AbbVie was not "in compliance with . . . the Federal anti-kickback statute" as it had certified. Further, compliance with the AKS is an implied precondition of reimbursement to providers submitting claims to the Government, even absent an express certification of compliance. "[C]ourts, without exception, agree that compliance with the AKS is a precondition of Medicare payment, such that liability under the False Claims Act can be predicated on a violation of the Anti-Kickback Statute." *United States ex rel. Westmoreland v. Amgen, Inc.*, 812 F. Supp.2d 39, 54 (D. Mass. 2011) (collecting cases). Therefore, all of claims for Government reimbursement of Humira prescriptions, which were ordered by providers and/or received by patients who participated in or received the value of the Nurse Ambassador Program, were materially false.

52.     If the Government had been aware that expensive Humira was prescribed as a result of such prohibited conduct, and that AbbVie was not "in compliance with . . . the Federal anti-kickback statute" when such prescriptions were written and claims for reimbursement submitted, the Government would not have been required to pay and likely would not have paid the claims submitted as a result of the Defendants' wrongdoing.

### C. **Direct Federal Health Insurance Plans.**

#### 1. **TRICARE/ VA Health Care/CHAMPVA.**

53.     TRICARE, administered by the Department of Defense ("DoD"), is the United

States military's health care system, designed to maintain the health of active duty service

personnel, provide health care during military operations, and offer health care to non-active

duty beneficiaries, including dependents of active duty personnel and military retirees and their

dependents. TRICARE is a triple-option benefit program designed to give beneficiaries a choice

between health maintenance organizations, preferred provider organizations and fee-for-service

benefits. Five managed care support contractors create networks of civilian health care providers.

54.     VA Health Care, administered by the Veterans Health Administration, a division

of the Department of Veterans Affairs, provides a medical benefits package to all enrolled

veterans.

55.     CHAMPVA, the Civilian Health and Medical Program of the Department of

Veterans Affairs, provides healthcare coverage to qualified families of deceased or 100%

disabled veterans.

#### 2. **Federal Employees Health Benefits Plan ("FEHBP").**

56.     The FEHBP provides health insurance coverage for nearly 8.7 million federal

employees, retirees and their dependents. The FEHBP is a collection of individual health care

plans, including the Blue Cross and Blue Shield Association, the National Association of Letter

Carriers ("NALC") Health Benefit Plan, and the Mail Handlers Benefit Plan. FEHBP plans are

managed by the Office of Personnel Management and collectively pay billions annually in

medical benefits and reimbursements.

## VI. SPECIFIC FRAUD ALLEGATIONS

### A. Humira is a multibillion-dollar blockbuster drug for AbbVie

57.     Humira (generic name adalimumab) is an injectable drug that is among a class of biologics called tumor necrosis factor ("TNF") inhibiting drugs.  TNF is a protein that signals the presence of an infection or tumor in the body, which in turn stimulates the immune system to attack the infection or tumor.  People with autoimmune disorders produce excessive TNF proteins, causing the immune system to attack healthy tissue.

58.     Humira is FDA-approved to treat several autoimmune disorders, specifically rheumatoid arthritis, juvenile idiopathic arthritis, psoriatic arthritis, ankylosing spondylitis, adult and pediatric Crohn's disease, ulcerative colitis, plaque psoriasis, and hidradenitis suppurativa. [Humira Package Insert]

59.     Humira is very expensive (treatments can cost over $5,000 per month).  Specialty biologic pharmaceuticals such as Humira currently represent the fastest-growing drug costs, with costs growing 14 to 20 percent per year while the rise in costs of traditional drugs has generally slowed.  U.S. spending on specialty pharmaceuticals in 2012 was approximately $87 billion, a number projected to hit $400 billion by 2020.  [UnitedHealth Center for Health Reform & Modernization, *Issue Brief: The Growth of Specialty Pharmacy* (April 2014) at 1-2].

60.     Specialty pharmaceutical costs particularly impact the cost of Government healthcare programs' reimbursements of drugs.  Medicare pays approximately twice as much for specialty pharmaceuticals on a per-capita basis than do private health insurance companies.  *Id.*

61.     Humira treats, but does not cure, the autoimmune disorders for which it is prescribed, so patients can and do stay on the drug for years and may take it indefinitely.  Hence,

each patient prescribed Humira, or who stays on Humira rather than switching to another medication, represents a significant profit for AbbVie.

## B. AbbVie spends hundreds of millions to promote Humira, including direct-to-consumer advertising and paying major prescribers

62.     AbbVie has heavily promoted Humira, including through an intensive direct-to-consumer television advertising campaign. In 2014, the advertising spend for Humira was a whopping $259 million, second only to Cialis, the ED medicine on which Eli Lilly spent $272 million. [T. Staton, *Pharma's ad spend vaults to $4.5B*, FiercePharmaMarketing.com, Mar. 25, 2015]

63.     AbbVie also spends millions annually in direct payments to doctors for "speaker fees" and other types of "consulting" to promote Humira. In just the period from August 2013 through December 2014, AbbVie spent $18.5 million on such payments, far in excess of the next-highest payments of $3.5 million it spent for its testosterone topical Androgel®, and representing over a third of the $54.3 million AbbVie spent for *all* its drugs during that period. [Dollars for Docs, ProPublica]

64.     One dermatologist, Jerry Bagel, M.D., of Windsor Dermatology, P.C., located in East Windsor, New Jersey, received $159,000 in payments from AbbVie during that period, making him among the top ten physicians paid by AbbVie. [*Id.*]

65.     AbbVie, and its predecessor Abbott, have employed aggressive and ethically questionable marketing tactics to promote Humira. For a time, Abbott offered a "Humira Mentor Program," through which patients on Humira could connect and communicate with (purportedly) existing Humira patients suffering from the same conditions. Promoting the program to rheumatoid arthritis patients, Abbott described the program as "an opportunity to connect with a

person living with moderate to severe rheumatoid arthritis who is managing their disease with HUMIRA." [Mentor Program Brochure]

66.     In or about mid-2012, Abbott abruptly canceled the program and shortly thereafter removed all references to the program from its website.

67.     AbbVie also owns the domain name "www.psoriasis.com" which it used to establish an "informational" website called psoriasisSPEAKS. Among other things, the website offers a search tool "Find the Right Doctor" which allows users to enter their ZIP code and obtain a list of local dermatologists. Upon information and belief, only dermatologists who AbbVie has identified as active prescribers of Humira (including those who are paid speakers or otherwise receive compensation to promote Humira) are "searchable" on AbbVie's database.

68.     AbbVie's marketing has succeeded in making Humira a huge "blockbuster" drug. In 2014, Humira grossed $13 billion in sales, which accounted for about 63% of AbbVie's annual revenues.

### C.  In part due to an impending loss of patent exclusivity, AbbVie has turned to unlawful practices to market Humira, to protect its huge revenues and dominant market share

69.     However, Humira may not continue to drive AbbVie's profits. Humira's patent expires in late 2016, and while there are not expected to be immediate generics or "biosimilars" to challenge its market share, the loss of exclusivity will likely drive the price (and hence the profits) down.

70.     In an effort to bolster Humira's already gigantic sales and shore up their golden-goose drug against competitors, AbbVie has implemented a marketing stratagem (contracting with Quintiles to help design and execute the stratagem) that, while disguised as a patient-assistance medical program, actually and in substance constitutes an illegal kickback scheme.

71.     Specifically, AbbVie and Quintiles have quietly assembled nationwide a virtual army of nurses (originally called "Psoriasis Patient Advocates" by corporate predecessor Abbott, now more grandly dubbed "Nurse Ambassadors" or "Humira Ambassadors") who are dispatched to patients' homes on request, ostensibly to help the patients learn how to safely and effectively self-administer the Humira injection. However, the real and improper purposes are to provide a wide variety of free services to patients, many far beyond the medical purpose of administering the injection, with the ultimate goals being to induce patients to stay on Humira who otherwise might switch to another medication, and to induce their physicians to continue to prescribe it.

72.     Among other things, the nurses assist and advise patients with regard to getting their prescriptions reimbursed by private insurance and/or by government programs, including filling out paperwork and submitting documentation. Nurses also provide patients with free goods such as sharps containers, travel storage packs, and other valuable items. Upon information and belief, nurses also provide patients with other medical services and advice not directly related to injecting Humira.

73.     The Humira Ambassadors also attempt to address and resolve direct costs to patients, such as co-pays, including by helping patients apply for co-pay reductions or reimbursement. Indeed, AbbVie provides a significant financial incentive to patients for enrolling in the Ambassador program is to reduce co-pays for patients.

74.     A Crohn's disease patient named Jaime acts as a patient advocate for Humira and the Ambassador Program, both in person and on a blog called "PrettyRottenGuts." Jaime's description of the Program corroborates Relator's information about the rapid recent growth of the Program; she also touts the Program's free services to patients as well as the free supplies they provide:

If you're not familiar with who a HUMIRA Nurse Ambassador is here's a quick summary. Over the past few years, AbbVie has hired (this is my biased opinion from meeting all these nurses over the past month) warm patient-facing nurses with a knack for patient education, who know how to dole out the right dose of tough love and empathy. . . . A HUMIRA Nurse Ambassador's primary responsibility is to ensure the patient and/or their caregiver has proper training on:

- How HUMIRA works
- Proper injection techniques
- Tips on how to eliminate pain and reduce redness at injection site
- Knowing when you should not inject
- Helping patients get phone numbers and web addresses for rebate renewal or financial hardship sponsorship
- Getting questions answered for potential side effects
- Reporting side effects directly to AbbVie; you may get a follow-up call
- Emotional and moral support - they understand giving yourself a shot like this every week or two weeks can be emotionally taxing. [PrettyRottenGuts blog]

75.    In January 2015, Jaime along with two other patients spoke to AbbVie employees

about their experience with Humira. Jaime reported on her blog that she was flown from her

home in Florida to Chicago, and that the three patients gave "testimonials on how Humira has

impacted our lives" to "over 60 new Humira Nurse Ambassadors, some sciency people, sales and

marketing folk." [*Id.*]

76.    Jamie also reported that AbbVie, was in the process of training "a new group of

Humira Nurse Ambassadors will hit the streets and will be catering to both new and existing

patients." She also reported that, having recently received a new Humira indication for pediatric

Crohn's disease, AbbVie was training still more nurses to service those patients: "Parents, don't

worry, if you don't currently have a nurse ambassador for your child, from what I understand a

new set of HUMIRA Nurse Ambassadors for Pediatric Crohn's disease patients will complete

their training soon." [*Id.*]

77.    AbbVie and Quintiles also use the Humira Ambassador program as an illegal

kickback to prescribers. In usual medical practice, the prescribing doctor, a nurse or medical

staff instruct patients how to self-administer injectable drugs. Indeed, the Ambassador Program initially provided nurses to patients primarily over the telephone (which is still part of the services provided). However, the sheer number and easy availability of Humira Ambassadors effectively remove that burden from prescribers.

78. Accordingly, and as described further herein, Defendants actively and vigorously promote the Ambassador program to physicians and other prescribers as a valuable and tangible economic benefit to their prescribing Humira to patients.

### D. Defendants' upper management is well aware of the fraudulent nature and unlawful purpose of the Humira Ambassador Program

79. Tellingly, the Humira Ambassador program is managed and, upon information and belief, financed from the marketing arm of AbbVie, not the medical-science arm. Nearly all of the executives and managers identified in Relator's investigation came from a sales and/or marketing background.

80. AbbVie tracks the success of the program by conducting "return-on-investment" calculations and analyses, weighing the costs of the program (and, likely, the legal risks) against the huge profits generated by Humira's expanding market share and volume. Such internal "ROI" analysis (which as noted is not publicized or shared with the investing public, despite its positive results) is a classic "red flag" demonstrating that the program's primary purpose is financial, not scientific or medical.

81. Another "red flag" is the lavish compensation – including significant incentive bonuses – that AbbVie pays the nurses. Annual salary for nurses (some of whom are fresh from nursing school and lack significant clinical experience) can be as much as $140,000. Nurses can also receive over $40,000 in additional pay depending on their success in generating and/or maintaining Humira prescriptions. [Nurse Ambassador Salary]

82.     Yet another "red flag" is the fact that Humira is typically dispensed through specialty pharmacies – pharmacies that specialize in high-cost, low-volume and/or perishable medicines (such as biologic injectables). Specialty pharmacies have long employed nurses and other healthcare workers who perform similar basic tasks as the Humira Ambassadors, in that they educate patients about the medicine and train them how to inject it. However, these pharmacies have usually provided these services by telephone, rather than in-person, with at least one pharmacy determining that house calls were too expensive and unnecessary given that they could achieve good therapy-adherence results with telephone calls and other reminders. [Express Script/CuraScript Overview] [Aetna Specialty Pharmacy]

83.     Therefore, Humira Ambassadors are in large measure duplicating and supplanting existing (legitimate) patient-training and information services provided by specialty pharmacies. However, unlike nurses who work for specialty pharmacies, Humira Ambassadors have a vested personal financial interest in patients' taking (and continuing to take) Humira, and no interest in patients' taking any other drug.

84.     AbbVie upper management is well aware of the impropriety of this scheme. In a recent private conversation, the executive who runs the Humira Nurse Ambassador program (Jack Rivetti, Director of Policy, Advocacy and Patient Relations) admitted[1] that management knows that the program is a "gray area" but they had continued to expand and grow the program because Humira was so profitable. He explained that if a nurse can keep only a few patients happy on Humira, that pays off for the company far in excess of what they pay the nurse. [Memo to File]

---

[1]     All statements attributed to particular witnesses herein are recounted in substance and in part, and are not necessarily restated verbatim.

85.     Rivetti also admitted that management knew that Humira was frequently

prescribed for off-label (non-FDA-approved) uses, but that the nurses provided their services

regardless of whether the prescription was for an on- or off-label use. Similarly, he admitted that

the company made no distinctions in the program for patients covered by government health

programs such as Medicare and Medicaid; any patient prescribed Humira could use the nurses.

He added that there was no limit to the number of visits a patient could receive from the nurses;

"if they want a nurse, they get a nurse."

## E.  AbbVie and Quintiles managers and nurse ambassadors corroborate Relator's information about the unlawful nature of the Humira Ambassador Program

86.     Further investigation has revealed a host of current and former AbbVie managers,

nurses and other employees who are or were directly involved in the Ambassador program.

Their descriptions largely corroborate Mr. Rivetti's admissions about the program.

87.     Maya Comerota Stewart is a Regional Manager for AbbVie, responsible for the

Central/Eastern Region. Since being promoted to that position in March 2013, Stewart hired,

trained and developed over 100 Nurse Ambassadors and 20 Managers across the Ambassador

program. She currently manages eight District Managers and 66 Nurse Ambassadors, plus

exercises strategic oversight of seven clinical nurse managers.

88.     Stewart reports that patients in the Ambassador program in her region had 63%

greater adherence to their medication than those not enrolled. She also reports a 6.1% market

share increase for health care providers who used the Ambassador Program, and a 17.1%

increase in time for sales representatives being present in offices using the program. For these

results, AbbVie gave her the Summit Award (top 2% in sales) for 2014 and 2015 which, upon

information and belief, included an all-expenses-paid vacation trip. [Maya Comerota Stewart

LinkedIn]

89.     Julie Robertson is a Regional Marketing Manager based in Denver, covering California, Arizona, Utah, Texas, New Mexico, Nevada, Mississippi, Arkansas, Louisiana, Tennessee, Oklahoma and Colorado. From April 2012 until April 2014, she was an Immunology Sales Specialist in the same area. She reports that during that period, given "aggressive growth goals," she succeeded in "increasing market share and exceeding quotas of HUMIRA in the Gastroenterology biologic market." She cites her work as a "[f]ield insight leader for the new HUMIRA Ambassador program" as a significant factor in exceeding her quota. [Julie Robertson LinkedIn]

90.     "Michael Z." is a District Manager of the Ambassador Program in the Chicago area. He "lead[s] a team of nurses to optimize the patient experience for the patients that we serve." He notes that the program operates "under the umbrella of Consumer Marketing." [Michael Z. LinkedIn]

91.     Reed Morton is a Program Manager of the Ambassador Program covering the Southeast U.S. He states that he "[c]oordinate[d] HUMIRA Ambassador launches among commercial team of 9 District Sales Managers and 28 Sales Representatives and Institutional Account Executives." He previously worked as a trainer for Humira Ambassadors. [Reed Morton LinkedIn]

92.     Tracey Calamita is a District Manager of the Ambassador Program based in Detroit, covering Michigan and Ohio, although she works on "training of new nurses, development of the program and managing nurses in 11 other states." She reports that she originated the program in her area "with myself and 2 other nurses, and has successfully expanded to over 130+ nurse educators within the past 2 years." Ms. Calamita touts her

"[s]uccessful and creative collaboration with team colleagues, sales team, and management team." [Tracey Calamita LinkedIn]

93. Amanda Bradhurst, R.N., is a Nurse Educator/Ambassador and District Sales Trainer. Formerly based in Palo Alto, California, now based in Denver, she works as a fill-in Nurse Ambassador in "West Coast regions with high patient enrollments or [a] shortage in nursing staff coverage." This role is dubbed the "west coast Relief/Bull Pen." She describes her duties as follows: "See patient within the home or office setting to do disease state education, product education, support services, connect them with resources, insurance education and support, ongoing adherence visits, AE follow-up, triage of care around the use of Humira." She also reports that she "work[s] with doctor office and sales teams to build relationships and support their use of [Humira]." [Amanda Bradhurst LinkedIn]

94. Michelle Mitrani, R.N., is a Nurse Ambassador for AbbVie/Quintiles based in Charlotte, North Carolina. She states she was involved in "[l]aunching, promoting, and expanding the market base for the Humira Ambassador program." Among other things, she notes that her responsibilities include "[f]ostering healthcare provider relationships utilizing a synergistic teamwork approach with AbbVie sales representatives." She also "educat[es] . . . healthcare providers and office staff" about "My Humira services." [Michelle Mitrani LinkedIn]

95. Shannon Ambrose, R.N., describes herself as a "Nurse Educator" for AbbVie's Ambassador Program, covering northern Colorado. She describes a myriad of services that she provides for Humira patients:

> My job includes disease state education, product education, injection training and insurance navigation, education and support. I help put the patients in contact with resources, support and services that can assist them. I assist patients in acquiring their medication and making it affordable. I educate them in how to work with their insurance companies, how to utilize copay assistance programs and if necessary how to apply for independent copay assistance programs and

financial aid. Once the patients acquire their medication I educate them on how to self administer it and try to review common mistakes before they occur. I take the time to make sure all of their questions and concerns are answered as best and I can, yet when necessary I refer them back to their physician for additional answers. The focus of my job is to create a better patient, who can help advocate for themselves when necessary and this is all done either in their home or at their office. After my patients are trained and self sufficient with their medication I provide ongoing support for any mishaps or insurance changes that occur down the road. I also spend time supporting the sales team to help educate providers as to why my services are beneficial. This project focuses on three areas; Gastroenterology, Rheumatology and Dermatology. [Shannon Ambrose LinkedIn]

96.     Wendi Prothero, B.S.N., describes herself as a "Nurse Educator" for AbbVie and Quintiles in the Washington, D.C. area. She states that she provides "[p]ersonal field-based and telephonic support, education, disease state awareness and injection training for patients prescribed biologic therapy to treat auto immune diseases." She "empower[s] them to navigate through the insurance and specialty pharmacy fulfillment process . . . [and] [p]rovide[s] adherence support and follow-up during long term biologic treatment." [Wendi Prothero LinkedIn]

97.     Tellingly, Quintiles does not publicly tout its success in bolstering AbbVie's Humira sales and market share with the Ambassador Program. However, it posted audio "podcasts" in May 2013 describing its "Patient Engagement and Adherence Solutions" services. The podcasts were in the form of an interview, and presented three "perspectives": the "clinical educator" (*i.e.*, Nurse Ambassador) perspective, the patient perspective, and the management perspective. These podcasts further reinforce the improper nature and purpose of the Ambassador Program and Quintile programs like it.

98.     In the "management perspective" podcast, Susan Hundley, then Director of Health Management Solutions, discusses how such programs affect a pharma company's day to day business operations. Hundley admits that, among other things, the clinical educator program

enables pharma companies to access doctors' offices that previously refused or were reluctant to admit sales reps on detailing calls: "For example, practices that were previously 'no-see' and 'difficult to see' would allow us in based on the benefits of our program. Before the clinical educator program, that just wasn't the case. And we've also seen how clinical educators' peer-to-peer knowledge pool creates new selling opportunities." Huntley acknowledges that "the clinical educator's relationship with the clinic staff can lead to improved patient education and stronger business relationships for the sponsoring company," specifically, "an increase in prescriptions starts . . . and higher refill rates." [Management Perspective Podcast Transcript]

99.    In the "Clinical Educator perspective" podcast, Shannon (last name not provided), a longtime clinical educator for Quintiles, describes her role as "filling the gap" between provider and patient and providing "individualized patient care." "Unlike the office staff that deals with many different conditions, the clinical educators have specific disease certification and experience. We don't replace the office staff, we augment their patient support." "I also provide patient with personalized care motivation, education and behavior models through customized adherence plans. And I answer treatment questions that come up on a daily basis that clinic staff aren't able to attend to. I also work closely with my patients to address their concerns or their barriers." Shannon notes that "[r]esearch shows that patients working with clinical educators have higher treatment adherence, which can improve the management of their condition."

100.    Shannon also admits that clinical educators provide medical advice to patients that they can't get from their own doctors, and even suggests that their knowledge base exceeds those of the prescribing physician: "I've seen even the most dedicated physicians just can't seem to keep up with all of the research for all of the conditions. We clinical educators typically focus

on a specific disease or drug for a specific condition. This means we can provide patients with current research and treatment approaches specific to our area of expertise, plus I can encourage patients to take their medicine as prescribed, and a physician just can't give that level of personal attention."

101. The "Patient Perspective" podcast features Ellen (last name not provided), a patient with an unidentified chronic condition who says she has used the services of clinical educator Shannon for six years. She states that she has frequent "scheduled engagements" with her clinical educator, which include phone calls and in-home visits. Comparing that relationship with her relationship with her doctor, she says her doctor and staff are "not always available for house calls" and might only see her every six weeks for checkups. However, she can have "daily scheduled check-ins with my clinical educator" whose "level of involvement and commitment gives me strength and helps me stay on my adherence plan." Shannon "understands my issues and customized my adherence plan" which Ellen said helps her "better manage my medications, my visits, and my daily life." "Thanks to Shannon, I've been on my therapy for the past six years." The interviewer adds: "Care should not end with a doctor's appointment but should be ongoing."

F. **Defendants' False Certifications of Compliance with the Law Constituted the Making of False Statements Material to False Claims**

102. As a party to the Medicaid Rebate Agreement between the Secretary of Health and Human Services pursuant to the Social Security Act, 42 U.S.C. 1396s, AbbVie (Labeler Code 00074), as well as various provider agreements, drug products are only eligible for reimbursement if and when AbbVie is in compliance with applicable federal and state laws.

103.    These laws include, but are not limited to, the federal and corresponding state anti-kickback statutes, the FDMA, the Food, Drug & Cosmetic Act and all related regulations, and HIPAA.

104.    As described in this Complaint, Defendants have knowingly and repeatedly violated these laws in their promotion of Humira. These violations have not been incidental, but instead have been central to AbbVie's sales and marketing strategy.

105.    Accordingly, AbbVie has, expressly and impliedly, falsely certified its compliance with these federal and state statutes and regulations.

106.    AbbVie's certifications of compliance with these statutes and regulations were material to the Government's decisions to make reimbursements for Humira.  Had the Governments known that AbbVie's certifications of compliance with the law were false, they would not have made reimbursements for Humira.

107.    AbbVie's false certifications of compliance with the law constituted the making, using, or causing to be made or used, false records or statements material to false or fraudulent claims, and they directly caused government programs to pay or reimburse for prescriptions that were not eligible for payment or reimbursement.

108.    AbbVie knew that its certifications of compliance with the law were false, and that its false certifications would cause the Governments to make payments for its drugs.

## VII.  EXAMPLES OF SPECIFIC FALSE CLAIMS

109.    As previously alleged, Jerry Bagel M.D. is a New Jersey dermatologist who is one of the top ten recipients of AbbVie payments for speaking fees and other purported consulting.

110. On his medical practice website, Dr. Bagel claims that he is "a nationally recognized expert in the treatment of psoriasis and is regularly invited to speak across the country and internationally about this medical condition and its treatment."

111. In exchange for the hundreds of thousands of dollars AbbVie pays him, Dr. Bagel regularly and vocally promotes Humira, both in forums aimed at patients/consumers and those whose audience comprises doctors and other medical professionals.

112. For example, on "dermcast.tv." the website of the Society of Dermatology Physician Assistants ("SDPA"), Dr. Bagel authored (purportedly) a "blog" which was nothing more than a rote recitation of Humira's indications, efficacy data, risk profile, and other information commonly found in Humira advertising. Notably, Dr. Bagel's blog cites "On-Call Nurse" as the number-one way in which Humira "[c]omplement[s] your support for your Humira patients," followed by "injection training kit[s]," the "Humira Protection Plan," "Pens and Syringes Disposal Service," and "Medication Reminders" – all free services and goods provided by the Humira Ambassadors.

113. Dr. Bagel also authors (purportedly) articles about Humira in scholarly medical journals. In 2011 alone, Dr. Bagel published two articles in medical journals touting the efficacy of Humira for psoriasis patients. [Archives of Dermatology (April 2011); Journal of the American Academy of Dermatology (April 2011)]

114. One of those articles claimed that patients on Humira benefited from also receiving periodic treatments exposing the skin to ultraviolet light (much like a tanning salon). The article noted that "[t]he combination of adalimumab [Humira] and phototherapy has not been previously explored." [Bagel, J., *Adalimumab plus narrowband ultraviolet B light*

*phototherapy for the treatment of moderate to severe psoriasis*, Journal of Drugs in Dermatology, April 2011.]

115.    In calendar year 2013, Dr. Bagel personally billed Medicare for 1,870 office treatments under the CMS billing code for "Skin application of tar and ultraviolet B or petrolatum and ultraviolet B." Dr. Bagel billed these treatments at an average rate of $138.84; Medicare reimbursed these claims an average of $64.88.

116.    Each and every one of those 1,870 claims for reimbursement, as well as each and every claim for reimbursement for Humira resulting from prescriptions for Humira written by Dr. Bagel or another provider at Windsor Dermatology for the patients who received those treatments, were false claims in violation of the Federal False Claims Act, because they were fraudulently induced by the Humira Ambassador Program's free services and goods, as well as by the exorbitant direct payments by AbbVie to Dr. Bagel.

## VIII. DAMAGES

117.    Since Defendants instituted the Humira Ambassador Program in or about early 2012, AbbVie has sold approximately $23.5 billion of Humira in the United States.

118.    Upon information and belief, Medicare, Medicaid and other government programs receive a discount for their reimbursement of Humira prescriptions. Nonetheless, upon information and belief, Humira has cost these programs at least $10 billion during that time period.

119.    The government programs that pay for Humira would not have reimbursed for the drug had they known about Defendants' unlawful kickback marketing scheme. Accordingly, the damages resulting from Defendants' False Claims Act violations total at least $10 billion, before trebling.

## COUNT I
### (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1); 31 U.S.C. § 3729(a)(1)(A))

120.    Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

121.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to the United States of America false or fraudulent claims for payment or approval, in violation of 31 U.S.C. § 3729(a)(1); 31 U.S.C. § 3729(a)(1)(A).

122.    As a result of Defendants' actions, as set forth above, the United States of America has been, and may continue to be, severely damaged.

## COUNT II
### (Violation of False Claims Act, 31 U.S.C. § 3729(a)(2); 31 U.S.C. § 3729(a)(1)(B))

123.    Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

124.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to the payment of false or fraudulent claims, in violation of 31 U.S.C. § 3729(a)(2); 31 U.S.C. §3729(a)(1)(B).

125.    The United States, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid and may continue to be paying or reimbursing for Humira® prescribed to patients enrolled in Federal Programs.

126.    As a result of Defendants' actions, as set forth above, the United States of America has been, and may continue to be, severely damaged.

## COUNT III
### (Violation of False Claims Act, 31 U.S.C. § 3729(a)(3); 31 U.S.C. § 3729(a)(1)(C))

127.    Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

128.    As detailed above, Defendants knowingly conspired, and may still be conspiring, with each other, and with individuals identified and described herein, to commit acts in violation of 31 U.S.C. §§ 3729(a)(1) & (a)(2); 31 U.S.C. §§ 3729(a)(1)(A) & (a)(1)(B). Defendants and these individuals committed overt acts in furtherance of the conspiracy as described above.

129.    As a result of Defendants' actions, as set forth above, the United States of America has been, and may continue to be, severely damaged.

## COUNT IV
### (Violations of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7a)

130.    Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

131.    By engaging in the conduct described above, Defendants have violated 42 U.S.C. § 1320a-7a and 42 C.F.R. § 1001.952(f).

132.    In particular, Defendants have knowingly submitted false claims or caused false claims to be submitted to the United States as the result of the payment of the above-described kickbacks.  The payment of kickbacks to induce and reward prescriptions for Humira constitutes remuneration to increase the level of business in violation of the law.

133.    As a result of Defendants' actions, as set forth above, the United States of America has been, and may continue to be, severely damaged because it paid for expensive

medications which, had the Government known were prescribed as a result of kickbacks, it would not otherwise have paid for and/or reimbursed.

## COUNT V
### (Violation of California False Claims Act)

134.    Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

135.    This is a civil action brought by Relator, on behalf of the State of California, against Defendants under the California False Claims Act, Cal. Gov't Code § 12652(c).

136.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval, in violation of Cal. Gov't Code § 12651(a)(1).

137.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of Cal. Gov't Code § 12651(a)(2).

138.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of California, or its political subdivisions, in violation of Cal. Gov't Code § 12651(a)(7).

139.     The State of California, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs for recipients of state and state subdivision funded health insurance programs.

140.     As a result of Defendants' actions, as set forth above, the State of California and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT VI
## (Violation of Colorado Medicaid False Claims Act)

141.     Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

142.     This is a civil action brought by Relator, on behalf of the State of Colorado, against Defendants under the Colorado Medicaid False Claims Act, Colo. Rev. Stat. § 25.5-4-306(2).

143.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented, or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the State of Colorado, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Colo. Rev. Stat. § 25.5-4-305(a).

144.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of Colo. Rev. Stat. § 25.5-4-305(b).

145. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Colorado, or its political subdivisions, in violation of Colo. Rev. Stat. § 25.5-4-305(f).

146. The State of Colorado, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs for recipients of state and state subdivision funded health insurance programs.

147. As a result of Defendants' actions, as set forth above, the State of Colorado and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT VII
## (Violation of Connecticut False Claims Act for Medical Assistance Programs)

148. Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

149. This is a civil action brought by Relator, on behalf of the State of Connecticut, against Defendants under the Connecticut False Claims Act for Medical Assistance Programs, Conn. Gen. Stat. § 17b-301d.

150. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented, or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the State of Connecticut, or its political subdivisions, false or fraudulent

claims for payment or approval under a medical assistance program administered by the

Department of Social Services, in violation of Conn. Gen. Stat. § 17b-301b(1).

151.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of

the information involved, or with actual knowledge of the falsity of the information, knowingly

made, used or caused to be made or used, and may still be making, using or causing to be made

or used, false records or statements to secure the payment or approval by the State of

Connecticut, or its political subdivisions, false or fraudulent claims under a medical assistance

program administered by the Department of Social Services, in violation of Conn. Gen. Stat.

§ 17b-301b(2).

152.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of

the information involved, or with actual knowledge of the falsity of the information, knowingly

made, used or caused to be made or used, and may still be making, using or causing to be made

or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit

money to the State of Connecticut, or its political subdivisions, under a medical assistance

program administered by the Department of Social Services, in violation of Conn. Gen. Stat.

§ 17b-301b(7).

153.    The State of Connecticut, or its political subdivisions, unaware of the falsity of

the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims

and/or statements, paid, and may continue to pay, for prescription drugs for recipients of state

and state subdivision funded health insurance programs.

154.    As a result of Defendants' actions, as set forth above, the State of Connecticut

and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT VIII
### (Violation of Delaware False Claims and Reporting Act)

155.     Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

156.     This is a civil action brought by of Relator, on behalf of the State of Delaware, against Defendants under the Delaware False Claims and Reporting Act, Del. Code Ann. tit. 6, § 1203(b).

157.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the State of Delaware, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Del. Code Ann. tit. 6, § 1201(a)(1).

158.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of Delaware, or its political subdivisions, in violation of Del. Code Ann. tit. 6, § 1201(a)(2).

159.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Delaware, or its political subdivisions, in violation of Del. Code Ann. tit. 6, § 120l(a)(7).

160.    The State of Delaware, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs for beneficiaries of healthcare programs funded by the State of Delaware.

161.    As a result of Defendants' actions, as set forth above, the State of Delaware and/or its political subdivisions have been, and may continue to be, severely damaged.

**COUNT IX**
**(Violation of District of Columbia False Claims Act)**

162.    Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

163.    This is a civil action brought by Relator, on behalf of the District of Columbia, against Defendants under the District of Columbia False Claims Act, D.C. Code § 2-308.15(b).

164.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented, or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the District, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of D.C. Code § 2-308.14(a)(l).

165.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be used, and may still be making, using, or causing to be made or used, false records or statements to get false claims paid or approved by the District, or its political subdivisions, in violation of D.C. Code § 2-308.14(a)(2).

166.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly

**SEALED QUI TAM COMPLAINT – Page 42 of 87**

made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the District, or its political subdivisions, in violation of D.C. Code § 2-308.14(a)(7).

167.    The District of Columbia, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance upon the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs for beneficiaries of health insurance programs funded by the District.

168.    As a result of Defendants' actions, as set forth above, the District of Columbia and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT X
### (Violation of Florida False Claims Act)

169.    Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

170.    This is a civil action brought by Relator, on behalf of the State of Florida, against Defendants under the Florida False Claims Act, Fla. Stat. § 68.083(2).

171.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the State of Florida, or its agencies, false or fraudulent claims for payment or approval, in violation of Fla. Stat. § 68.082(2)(a).

172.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made

or used, false records or statements to get false or fraudulent claims paid or approved by the State of Florida, or its agencies, in violation of Fla. Stat. § 68.082(2)(b).

173.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Florida, or its agencies, in violation of Fla. Stat. § 68.082(2)(g).

174.    The State of Florida, or its agencies, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs for beneficiaries of health insurance plans funded by the State of Florida or its agencies.

175.    As a result of Defendants' actions, as set forth above, the State of Florida and/or its agencies have been, and may continue to be, severely damaged.

## COUNT XI
### (Violation of Georgia False Medicaid Claims Act)

176.    Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

177.    This is a civil action brought by Relator, on behalf of the State of Georgia, against Defendants pursuant to the Georgia False Medicaid Claims Act, Ga. Code Ann. §49-4-168.2(b).

178.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to the Georgia Medicaid program false or fraudulent claims for payment or approval, in violation of Ga. Code Ann. § 49-4-168.1(a)(1).

**SEALED QUI TAM COMPLAINT – Page 44 of 87**

179.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Georgia Medicaid program, in violation of Ga. Code Ann. § 49-4-168.1(a)(2).

180.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Georgia, or its political subdivisions, in violation of Ga. Code Ann. § 49-4-168.1(a)(7).

181.     The State of Georgia, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs for recipients of Medicaid.

182.     As a result of Defendants' actions, as set forth above, the State of Georgia and/or political subdivisions have been, and may continue to be, severely damaged.

## COUNT XII
### (Violation of Hawaii False Claims Act)

183.     Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

**SEALED QUI TAM COMPLAINT – Page 45 of 87**

184.     This is a civil action brought by Relator, on behalf of the State of Hawaii, against Defendants under the Hawaii False Claim Act, Haw. Rev. Stat. § 661-25.

185.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the State of Hawaii, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Haw. Rev. Stat. § 661-21(a)(l).

186.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made and used, and may still be making, using or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of Hawaii, or its political subdivisions, in violation of Haw. Rev. Stat. § 661-21(a)(2).

187.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Hawaii, or its political subdivisions, in violation of Haw. Rev. Stat. § 661-21(a)(7).

188.     The State of Hawaii, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance upon the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs for recipients of state funded health insurance programs.

189.    As a result of Defendants' actions, as set forth above, the State of Hawaii and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT XIII
### (Violation of Illinois False Claims Act)

190.    Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

191.    This is a civil action brought by Relator, on behalf of the State of Illinois, against Defendants under the Illinois False Claims Act, 740 Ill. Comp. Stat. 175/4(b).

192.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval, in violation of 740 Ill. Comp. Stat. 175/3(a)(1)(A).

193.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements material to get false or fraudulent claims paid or approved by the State of Illinois, or its political subdivisions, in violation of 740 Ill. Comp. Stat. 175/3(a)(1)(B).

194.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements material to conceal, avoid or decrease an obligation to pay or transmit money to the State of Illinois, or its political subdivisions, in violation of 740 Ill. Comp. Stat. 175/3(a)(1)(G).

195.    The State of Illinois, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of those claims and/or statements, paid, and may continue to pay, for prescription drugs for recipients of state funded health insurance programs.

196.    As a result of Defendants' actions, as set forth above, the State of Illinois and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT XIV
## (Violation of Indiana False Claims and Whistleblower Protection Act)

197.    Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

198.    This is a civil action brought by Relator, on behalf of the State of Indiana, against Defendants under the Indiana False Claims and Whistleblower Protection Act, Ind. Code § 5-11-5.5-4(a).

199.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally presented, or caused to be presented, and may still be presenting or causing to be presented, false claims to the State of Indiana, or its political subdivisions, for payment or approval, in violation of Ind. Code § 5-11-5.5-2(b)(l).

200.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to obtain payment or approval of false claims from the State of Indiana, or its political subdivisions, in violation of Ind. Code § 5-11-5.5-2(b)(2).

201.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to avoid an obligation to pay or transmit money to the State of Indiana, or its political subdivisions, in violation of Ind. Code § 5-11-5.5-2(b)(6).

202.    The State of Indiana, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of those claims and/or statements, paid, and may continue to pay, for prescription drugs for recipients of state funded health insurance programs.

203.    As a result of Defendants' actions, as set forth above, the State of Indiana and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT XV
### (Violation of Iowa False Claims Act)

204.    Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

205.    This is a civil action brought by Relator, on behalf of the State of Iowa, against Defendants under the Iowa False Claims Act, Iowa Code § 685.3(2)(a).

206.    Defendants, in reckless disregard or deliberate ignorance for the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented, or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval, in violation of Iowa Code § 685.2(1)(a).

207.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly

made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of Iowa Code § 685.2(1)(b).

208.  Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still me making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Iowa, or its political subdivisions, in violation of Iowa Code § 685.2(1)(g).

209.  The State of Iowa, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid for prescription drugs for beneficiaries of health insurance programs funded by the state or its political subdivisions.

210.  As a result of Defendants' actions, as set forth above, the State of Iowa and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT XVI
## (Violation of Louisiana Medical Assistance Programs Integrity Law)

211.  Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

212.  This is a civil action brought by Relator, on behalf of the State of Louisiana's medical assistance programs, against Defendants under the Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. Ann. § 46:439.1.

213.  Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly

presented, or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims, in violation of La. Rev. Stat. Ann. § 46:438.3(A).

214.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly engaged in misrepresentation, and may still be engaging in misrepresentation, to obtain, or attempt to obtain, payment from medical assistance programs funds, in violation of La. Rev. Stat. Ann. § 46:438.3(B).

215.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly submitted, and may continue to submit, claims for goods, services or supplies which were medically unnecessary or which were of substandard quality or quantity, in violation of La. Rev. Stat. Ann. § 46:438.3(D).

216.    The State of Louisiana, its medical assistance programs, political subdivisions and/or the Department, unaware of the falsity of the claims and/or statements made by Defendants, or their actions as set forth above, acted in reliance, and may continue to act in reliance, on the accuracy of Defendants' claims and/or statements in paying for prescription drugs for medical assistance program recipients.

217.    As a result of Defendants' actions, as set forth above, the State of Louisiana, its medical assistance programs, political subdivisions and/or the Department have been, and may continue to be, severely damaged.

## COUNT XVII
### (Violation of Maryland False Health Claims Act)

218.    Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

219.    This is a civil action brought by Relator, on behalf of the State of Maryland, against Defendants under the Maryland False Health Claims Act of 2010, Md. Code Ann., Health-Gen. § 2-604.

220.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval, in violation of Md. Code Ann., Health-Gen. § 2-602(a)(1).

221.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of Md. Code Ann., Health-Gen. § 2-602(a)(2).

222.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still me making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Maryland, or its political subdivisions, in violation of Md. Code Ann., Health-Gen. § 2-602(a)(8).

223.     The State of Maryland, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid for prescription drugs for beneficiaries of health insurance programs funded by the state or its political subdivisions.

224.     As a result of Defendants' actions, as set forth above, the State of Maryland and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT XVIII
### (Violation of Massachusetts False Claims Act)

225.     Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

226.     This is a civil action brought by Relator, on behalf of the Commonwealth of Massachusetts, against Defendants under the Massachusetts False Claims Act, Mass. Gen. Laws ch. 12 § 5C(2).

227.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval, in violation of Mass. Gen. Laws ch. 12 § 5B(1).

228.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to obtain payment or approval of claims by the Commonwealth of Massachusetts, or its political subdivisions, in violation of Mass. Gen. Laws ch. 12 § 5B(2).

229.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the Commonwealth of Massachusetts, or its political subdivisions, in violation of Mass. Gen. Laws ch. 12 § 5B(8).

230.    The Commonwealth of Massachusetts, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs for beneficiaries of health insurance programs funded by the state or its political subdivisions.

231.    As a result of Defendants' actions, as set forth above, the Commonwealth of Massachusetts and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT XIX
## (Violation of Michigan Medicaid False Claims Act)

232.    Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

233.    This is a civil action brought by Relator, on behalf of the State of Michigan, against Defendants under the Michigan Medicaid False Claims Act, Mich. Comp. Laws § 400.610a(1).

234.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made or caused to be made, and may still be making or causing to be made, false statements or

false representations of material facts in an application for Medicaid benefits, in violation of Mich. Comp. Laws § 400.603(1).

235. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made or caused to be made false statements or false representations of a material fact for use in determining rights to a Medicaid benefit, in violation of Mich. Comp. Laws § 400.603(2).

236. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly concealed or failed to disclose, and may still be concealing or failing to disclose, an event affecting its initial or continued right to receive a Medicaid benefit, or the initial or continued right of any other person on whose behalf Defendants has applied for or is receiving a benefit with intent to obtain a benefit to which Defendants were not entitled or in an amount greater than that to which Defendants were entitled, in violation of Mich. Comp. Laws § 400.603(3).

237. Defendants, in possession of facts under which they are aware or should be aware of the nature of their conduct and that their conduct is substantially certain to cause the payment of a Medicaid benefit, knowingly made, presented or caused to be made or presented, and may still be presenting or causing to be presented, to an employee or officer of the State of Michigan, or its political subdivisions, false claims under the Social Welfare Act, Mich. Comp. Laws §§ 400.1-400.122, in violation of Mich. Comp. Laws § 400.607(1).

238. The State of Michigan, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of Medicaid.

239.    As a result of Defendants' actions, as set forth above, the State of Michigan
and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT XX
### (Violation of Minnesota False Claims Act)

240.    Relator incorporates herein by reference the preceding paragraphs of this
Complaint as though fully set forth herein.

241.    This is a civil action brought by Relator, on behalf of the State of Minnesota,
against Defendants under the Minnesota False Claims Act, Minn. Stat. § 15C.05(a).

242.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of
the information involved, or with actual knowledge of the falsity of the information, knowingly
presented or caused to be presented, and may still be presenting or causing to be presented, to an
officer or employee of the State of Minnesota, or its political subdivisions, false or fraudulent
claims for payment or approval, in violation of Minn. Stat. § 15C.02(a)(1).

243.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of
the information involved, or with actual knowledge of the falsity of the information, knowingly
made, used or caused to be made or used, and may still be making, using or causing to be made
or used, false records or statements to get false or fraudulent claim paid or approved by the State
of Minnesota, or its political subdivisions, in violation of Minn. Stat. § 15C.02(a)(2).

244.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of
the information involved, or with actual knowledge of the falsity of the information, knowingly
made, used, or caused to be made or used, and may still be making, using or causing to be made
or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit
money to the State of Minnesota, or its political subdivisions, in violation of Minn. Stat. §
15C.02(a)(7).

245.    The State of Minnesota, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs for beneficiaries of state and state subdivision funded health insurance programs.

246.    As a result of Defendants' actions, as set forth above, the State of Minnesota and/or its political subdivisions have been, and may continue to be, severely damaged.

### COUNT XXI
### (Violation of Montana False Claims Act)

247.    Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

248.    This is a civil action brought by Relator, on behalf of the State of Montana against, Defendants under the Montana False Claims Act, Mont. Code Ann. § 17-8-406(1).

249.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the State of Montana, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Mont. Code Ann. § 17-8-403(1)(a).

250.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of Montana, or its political subdivisions, in violation of Mont. Code Ann. § 17-8-403(1)(b).

251.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly

made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Montana, or its political subdivisions, in violation of Mont. Code Ann. § 17-8-403(1)(g).

252.     The State of Montana, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs for beneficiaries of health insurance programs funded by the state or its political subdivisions.

253.     As a result of Defendants' actions, as set forth above, the State of Montana and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT XXII
### (Violation of Nevada False Claims Act)

254.     Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

255.     This is a civil action brought by Relator, on behalf of the State of Nevada, against Defendants under the Nevada False Claims Act, Nev. Rev. Stat. § 357.080(1).

256.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false claims for payment or approval, in violation of Nev. Rev. Stat. § 357.040(1)(a).

257.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made

or used, false records or statements to obtain payment or approval of false claims, in violation of Nev. Rev. Stat. § 357.040(1)(b).

258.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Nevada, or its political subdivisions, in violation of Nev. Rev. Stat. § 357.040(1)(g).

259.    The State of Nevada, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs for beneficiaries of health insurance programs funded by the state or its political subdivisions.

260.    As a result of Defendants' actions, as set forth above, the State of Nevada and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT XXIII
### (Violation of New Jersey False Claims Act)

261.    Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

262.    This is a civil action brought by Relator, on behalf of the State of New Jersey, against Defendants pursuant to the New Jersey Fraud False Claims Act, N.J. Stat. Ann. § 2A:32C-5(b).

263.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly

or intentionally presented or caused to be presented, and may still be presenting or causing to be presented, to an employee, officer or agent of the State of New Jersey, or to any contractor, grantee, or other recipient of State funds, false or fraudulent claims for payment or approval, in violation of N.J. Stat. Ann. § 2A:32C-3(a).

264. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to made or used, and may still be making, using or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of New Jersey, or its political subdivisions, in violation of N.J. Stat. Ann. § 2A:32C-3(b).

265. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of New Jersey, or its political subdivisions, in violation of N.J. Stat. Ann. § 2A:32C-3(g).

266. The State of New Jersey, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs for recipients of Medicaid.

267. As a result of Defendants' actions, as set forth above, the State of New Jersey and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT XXIV
## (Violation of New Mexico Medicaid False Claims Act)

268.    Relator incorporates herein by reference the preceding paragraphs of this
Complaint as though fully set forth herein.

269.    This is a civil action brought by Relator, on behalf of the State of New Mexico,
against Defendants under the New Mexico Medicaid False Claims Act, N.M. Stat. Ann. § 27-14-
7(B).

270.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of
the information involved, or with actual knowledge of the falsity of the information, knowingly
presented or caused to be presented, and may still be presenting or causing to be presented, to the
State of New Mexico, or its political subdivisions, false or fraudulent claims for payment under
the Medicaid program, in violation of N.M. Stat. Ann. § 27-14-4(A).

271.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of
the information involved, or with actual knowledge of the falsity of the information, knowingly
made, used or caused to be made or used, and may still be making, using or causing to be made
or used, false records or statements to obtain false or fraudulent claims under the Medicaid
program paid for or approved by the State of New Mexico, or its political subdivisions, in
violation of N.M. Stat. Ann. § 27-14-4(C).

272.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of
the information involved, or with actual knowledge of the falsity of the information, knowingly
made, used, or caused to be made or used, and may still be making, using or causing to be made
or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit
money to the State of New Mexico, or its political subdivisions, relative to the Medicaid
program, in violation of N.M. Stat. Ann. § 27-14-4(E).

273.     The State of New Mexico, or its political subdivisions, unaware of the falsity of
the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims
and/or statements, paid, and may continue to pay, for prescription drugs for beneficiaries of
health insurance programs funded by the state or its political subdivisions.

274.     As a result of Defendants' actions, as set forth above, the State of New Mexico
and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT XXV
### (Violation of New York False Claims Act)

275.     Relator incorporates herein by reference the preceding paragraphs of this
Complaint as though fully set forth herein.

276.     This is a civil action brought by Relator, on behalf of the State of New York,
against Defendants under the New York False Claims Act, N.Y. State Fin. Law § 190(2).

277.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of
the information involved, or with actual knowledge of the falsity of the information, knowingly
presented or caused to be presented, and may still be presenting or causing to be presented, false
or fraudulent claims for payment or approval, in violation of N.Y. State Fin. Law § 189(1)(a).

278.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of
the information involved, or with actual knowledge of the falsity of the information, knowingly
made, used or caused to be made or used, and may still be making, using or causing to be made
or used, false records or statements material to false or fraudulent claims, in violation of N.Y.
State Fin. Law § 189(1)(b).

279.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of
the information involved, or with actual knowledge of the falsity of the information, knowingly
made, used, or caused to be made or used, and may still be making, using or causing to be made

or used, false records or statements material to an obligation to pay or transmit money to the State of New York, or its political subdivisions, in violation of N.Y. State Fin. Law § 189(1)(g).

280.    The State of New York, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs for beneficiaries of health insurance programs funded by the state or its political subdivisions.

281.    As a result of Defendants' actions, set forth above, the State of New York and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT XXVI
### (Violation of North Carolina False Claims Act)

282.    Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

283.    This is a civil action brought by Relator, on behalf of the State of North Carolina, against Defendants under the North Carolina False Claims Act, N.C. Gen. Stat. § 1-608(b).

284.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval, in violation of N.C. Gen. Stat. § 1-607(a)(1).

285.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of N.C. Gen. Stat. § 1-607(a)(2).

286. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of North Carolina, or its political subdivisions, in violation of N.C. Gen. Stat. § 1-607(a)(7).

287. The State of North Carolina, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs for beneficiaries of health insurance programs funded by the state or its political subdivisions.

288. As a result of Defendants' actions, as set forth above, the State of North Carolina and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT XXVII
## (Violation of Oklahoma Medicaid False Claims Act)

289. Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

290. This is a civil action brought by Relator, on behalf of the State of Oklahoma, against Defendants pursuant to the Oklahoma Medicaid False Claims Act, Okla. Stat. tit. 63, § 5053.2(B)(1).

291. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an

officer or employee of the State of Oklahoma, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Okla. Stat. tit. 63, § 5053.1(B)(1).

292. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made or caused to be made, and may still be making or causing to be made, false records or statements to get false or fraudulent claims paid or approved by the State of Oklahoma, or its political subdivisions, in violation of Okla. Stat. tit. 63, § 5053.1(B)(2).

293. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Oklahoma, or its political subdivisions, in violation of Okla. Stat. tit. 63, § 5053.1(B)(7).

294. The State of Oklahoma, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs for recipients of Medicaid.

295. As a result of Defendants' actions, as set forth above, the State of Oklahoma and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT XXVIII
### (Violation of Rhode Island False Claims Act)

296. Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

297. This is a civil action brought by Relator, on behalf of the State of Rhode Island, against Defendants pursuant to the Rhode Island False Claims Act, R.I. Gen. Laws § 9-1.1-4(b).

298. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the State of Rhode Island or a member of Rhode Island's National Guard, false or fraudulent claims for payment or approval, in violation of R.I. Gen. Laws § 9-1.1-3(a)(1).

299. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made or caused to be made, and may still be making or causing to be made, false records or statements to get false or fraudulent claims paid or approved by the State of Rhode Island, or its political subdivisions, in violation of R.I. Gen. Laws § 9-1.1-3(a)(2).

300. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Rhode Island, or its political subdivisions, in violation of R.I. Gen. Laws § 9-1.1-3(a)(7).

301. The State of Rhode Island, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs for recipients of Medicaid.

302.     As a result of Defendants' actions, as set forth above, the State of Rhode Island and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT XXIX
### (Violation of Tennessee Medicaid False Claims Act)

303.     Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

304.     This is a civil action brought by Relator, on behalf of the State of Tennessee, against Defendants under the Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-183(b).

305.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to the State of Tennessee, or its political subdivisions, false or fraudulent claims for payment under the Medicaid program,, in violation of Tenn. Code Ann. § 71-5-182(a)(1)(A).

306.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false or fraudulent records or statements to get false or fraudulent claims under the Medicaid program paid for or approved by the State of Tennessee, or its political subdivisions, in violation of Tenn. Code Ann. § 71-5-182(a)(1)(B).

307.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made

or used, false or fraudulent records or statements to conceal, avoid or decrease an obligation to pay or transmit money to the State of Tennessee, or its political subdivisions, relative to the Medicaid program, in violation of Tenn. Code Ann. § 71-5-182(a)(1)(D).

308. The State of Tennessee, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs for recipients of the Medicaid program.

309. As a result of Defendants' actions, as set forth above, the State of Tennessee and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT XXX
### (Violation of Texas Medicaid Fraud Prevention Act)

310. Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

311. This is a civil action brought by Relator, on behalf of the State of Texas against, Defendants under the Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code Ann. §36.101(a).

312. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made or caused to be made, and may still be making or causing to be made, false statements or misrepresentations of material fact that permitted Defendants to receive a benefit or payment under the Medicaid program that was not authorized or that was greater than the benefit or payment that was authorized, in violation of Tex. Hum. Res. Code Ann. § 36.002(1).

313. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly

**SEALED QUI TAM COMPLAINT – Page 68 of 87**

concealed or failed to disclose, or caused to be concealed or not disclosed — and may still be concealing or failing to disclose, or causing to be concealed or not disclosed — information that permitted Defendants to receive a benefit or payment under the Medicaid program that was not authorized or that was greater than the payment that was authorized, in violation of Tex. Hum. Res. Code Ann. § 36.002(2).

314.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, caused to be made, induced or sought to induce, and may still be making, causing to be made, inducing or seeking to induce, false statements or misrepresentations of material fact concerning information required to be provided by a federal or state law, rule, regulation or provider agreement pertaining to the Medicaid program, in violation of Tex. Hum. Res. Code Ann. § 36.002(4)(B).

315.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, and may still be making, claims under the Medicaid program for services or products that were inappropriate, in violation of Tex. Hum. Res. Code Ann. § 36.002(7)(C).

316.    The State of Texas, or it political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs for recipients of Medicaid.

317.    As a result of Defendants' actions, as set forth above, the State of Texas and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT XXXI
### (Violation of Virginia Fraud Against Taxpayers Act)

318.    Relator incorporates herein by reference the preceding paragraphs of this
Complaint as though fully set forth herein.

319.    This is a civil action brought by Relator, on behalf of the Commonwealth of
Virginia, against Defendants under the Commonwealth of Virginia Fraud Against Taxpayers
Act, Va. Code Ann. § 8.01-216.5(A).

320.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of
the information involved, or with actual knowledge of the falsity of the information, knowingly
presented or caused to be presented, and may still be presenting or causing to be presented, to an
officer or employee of the Commonwealth of Virginia, or its political subdivisions, false or
fraudulent claims for payment or approval, in violation of Va. Code Ann. § 8.01-216.3(A)(1).

321.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of
the information involved, or with actual knowledge of the falsity of the information, knowingly
made, used, or caused to be made or used, and may still be making, using or causing to be made
or used, false records or statements to get false or fraudulent claims paid or approved by the
Commonwealth of Virginia, or its political subdivisions, in violation of Va. Code Ann. § 8.01-
216.3(A)(2).

322.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of
the information involved, or with actual knowledge of the falsity of the information, knowingly
made, used or caused to be made or used, and may still be making, using or causing to be made
or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit
money to the Commonwealth of Virginia, or its political subdivisions, in violation of Va. Code
Ann. § 8.01-216.3(A)(7).

323.     The Commonwealth of Virginia, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance upon the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs for recipients of state funded health insurance programs.

324.     As a result of Defendants' actions, as set forth above, the Commonwealth of Virginia and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT XXXII
### (Violation of Washington Medicaid False Claims Act)

325.     Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

326.     This is a civil action brought by Relator, on behalf of the State of Washington, against Defendants under the Washington Medicaid False Claims Act, S. 5978, 2nd Cong. § 205.

327.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment of approval, in violation of S. 5978, 2nd Cong. § 202(1)(a).

328.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of S. 5978, 2nd Cong. § 202(1)(b).

329.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made

or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Washington, or its political subdivisions, in violation of S. 5978, 2nd Cong. § 202(1)(g).

330. The State of Washington, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance upon the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs for recipients of state funded health insurance programs.

331. As a result of Defendants' actions, as set forth above, the State of Washington and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT XXXIII
### (Violation of Wisconsin False Claims for Medical Assistance Law)

332. Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

333. This is a civil action brought by Relator, on behalf of the State of Wisconsin, against Defendants under the Wisconsin False Claims for Medical Assistance Law, Wis. Stat. §20.931(5)(a).

334. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to any officer, or employee, or agent of the State of Wisconsin, or its political subdivisions, false or fraudulent claims for medical assistance, in violation of Wis. Stat. § 20.931(2)(a).

335. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made

**SEALED QUI TAM COMPLAINT – Page 72 of 87**

or used, false records or statements to obtain approval or payment of false claims for medical assistance, in violation of Wis. Stat. § 20.931(2)(b).

336.    The State of Wisconsin, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance upon the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs for recipients of state funded health insurance programs.

337.    As a result of Defendants' actions, as set forth above, the State of Wisconsin and/or its political subdivisions have been, and may continue to be, severely damaged.

**WHEREFORE,** Relator prays for judgment against Defendants as follows:

A.    That Defendants be ordered to cease and desist from submitting or causing to be submitted any more false claims, or further violating 31 U.S.C. § 3729 *et seq.*; Cal. Gov't Code § 12650 *et seq.*; Colo. Rev. Stat. § 25.5-4-304 *et seq.*; Conn. Gen. Stat. § 17b-301a *et seq.*; Del. Code Ann. tit. 6, § 1201 *et seq.*; D.C. Code § 2-308.13 *et seq.*; Fla. Stat. § 68.081 *et seq.*; Ga. Code Ann. § 49-4-168 *et seq.*; Haw. Rev. Stat. § 661-21 *et seq.*; 740 Ill. Comp. Stat. § 175/1 *et seq.*; Ind. Code § 5-11-5.5 *et seq.*; Iowa Code § 685.1 *et seq.*; La. Rev. Stat. Ann. § 46:437.1 *et seq.*; Md. Code Ann., Health-Gen. § 2-601 *et seq.*; Mass. Gen. Laws ch. 12, § 5A *et seq.*; Mich. Comp. Laws § 400.601 *et seq.*; Minn. Stat. § 15C.01 *et seq.*; Mont. Code Ann. § 17-8-401 *et seq.*; Nev. Rev. Stat. § 357.010 *et seq.*; N.J. Stat. Ann. § 2A:32C-1 *et seq.*; N.M. Stat. Ann. § 27-14-1 *et seq.*; N.Y. State Fin. Law § 187 *et seq.*; N.C. Gen. Stat. § 1-605 *et seq.*; Okla. Stat. tit. 63, § 5053 *et seq.*; R.I. Gen. Laws § 9-1.1-1 *et seq.*; Tenn. Code Ann. § 71-5-181 *et seq.*; Tex. Hum. Res. Code Ann. § 36.001 *et seq.*; Va. Code Ann. § 8.01-216.1 *et seq.*; S. 5978, 2nd Cong. § 201 *et seq.*; and Wis. Stat. § 20.931 *et seq.*

B.    That judgment be entered in Relator's favor and against Defendants in the

amount of each and every false or fraudulent claim, multiplied as provided for in 31 U.S.C. § 3729(a), plus a civil penalty of not less than five thousand ($5,000) or more than ten thousand dollars ($10,000) per claim as provided by 31 U.S.C. § 3729(a), to the extent such multiplied penalties shall fairly compensate the United States of America for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

C. That Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d), Cal. Gov't Code § 12652(g)(4), Colo. Rev. Stat. § 25.5-4-306(4), Conn. Gen. Stat. § 17b-301e(e), Del. Code Ann. tit. 6, § 1205, D.C. Code § 2-308.15(f), Fla. Stat. § 68.085, Ga. Code Ann. § 49-4-168.2(i), Haw. Rev. Stat. § 661-27, 740 Ill. Comp. Stat. § 175/4(d), Ind. Code § 5-11-5.5-6, Iowa Code § 685.3(4)(a)(1), La. Rev. Stat. Ann. § 439.4, Md. Code Ann., Health- Gen. § 2-605, Mass. Gen. Laws ch.12, § 5F, Mich. Comp. Laws § 400.610a(9), Minn. Stat. § 15C.13, Mont. Code Ann. § 17-8-410, Nev. Rev. Stat. § 357.210, N.J. Stat. Ann. § 2A:32C-7, N.M. Stat. Ann. § 27-14-9, N.Y. State Fin. Law § 190(6), N.C. Gen. Stat. § 1-610, Okla. Stat. tit. 63, § 5053.4, R.I. Gen. Laws § 9-1.1-4(d), Tenn. Code Ann. § 71-5-183(d), Tex. Hum. Res. Code Ann. § 36.110, Va. Code Ann. § 8.01-216.7, S. 5978, 2nd Cong. § 207(1), and Wis. Stat. §20.931(11), including reasonable attorneys' fees and litigation costs.

D. That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of California or its political subdivisions multiplied as provided for in Cal. Gov't Code § 12651(a), plus a civil penalty of not less than five thousand dollars ($5,000) per claim or more than ten thousand dollars ($10,000) per claim as provided by Cal. Gov't Code § 12651(a), to the extent such penalties shall fairly compensate the

State of California or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

E.       That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of Colorado or its political subdivisions multiplied as provided for in Colo. Rev. Stat. § 25.5-4-305(1), plus a civil penalty of not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) for each act as provided by Colo. Rev. Stat. § 25.5-4-305(1), to the extent such multiplied penalties shall fairly compensate the State of Colorado or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

F.       That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of Connecticut multiplied as provided for in Conn. Gen. Stat. § 17b-301b(b)(2), plus a civil penalty of not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) for each act in violation of the State of Connecticut False Claims Act, as provided by Conn. Gen. Stat. § 17b-301b(b)(1), to the extent such multiplied penalties shall fairly compensate the State of Connecticut for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

G.       That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of Delaware multiplied as provided for in Del. Code Ann. tit. 6, §1201(a), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) for each act in violation of the

Delaware False Claims and Reporting Act, as provided by Del. Code Ann. tit. 6, §1201(a), to the extent such multiplied penalties shall fairly compensate the State of Delaware for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

H.     That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the District of Columbia, multiplied as provided for in D.C. Code § 2-308.14(a), plus a civil penalty of not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) for each false claim, and the costs of this civil action brought to recover such penalty and damages, as provided by D.C. Code § 2-308.14(a), to the extent such multiplied penalties shall fairly compensate the District of Columbia for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

I.     That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of Florida or its agencies multiplied as provided for in Fla. Stat. § 68.082(2), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) for each false claim as provided by Fla. Stat. Ann. § 68.082(2), to the extent such multiplied penalties shall fairly compensate the State of Florida or its agencies for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

J.     That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of Georgia or its political subdivisions multiplied as provided for in Ga. Code Ann. § 49-4-168.1(a), plus a civil penalty of not less than five

thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) per false claim as provided by Ga. Code Ann. § 49-4-168.1(a), to the extent such multiplied penalties shall fairly compensate the State of Georgia or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

K.      That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of Hawaii, multiplied as provided for in Haw. Rev. Stat. § 661-21(a), plus a civil penalty of not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) as provided by Haw. Rev. Stat. § 661-21(a), to the extent such multiplied penalties shall fairly compensate the State of Hawaii for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

L.      That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of Illinois, multiplied as provided for in 740 Ill. Comp. Stat. § 175/3(a)(1)(A), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000), as provided by 740 Ill. Comp. Stat. §175/3(a)(1)(A), and the costs of this civil action as provided by 740 Ill. Comp. Stat. §175/3(a)(1)(B), to the extent such penalties shall fairly compensate the State of Illinois for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

M.      That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of Indiana, multiplied as provided for in Ind. Code § 5-11- 5.5-2(b), plus a civil penalty of at least five thousand dollars ($5,000) as provided by

Ind. Code § 5-11-5.5-2(b), to the extent such penalties shall fairly compensate the State of Indiana for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

N.      That judgment be entered in Relator's favor and against Defendants in the amount of damages sustained by the State of Iowa, multiplied as provided for in Iowa Code § 685.2(1), plus a civil penalty of not less than five thousand dollars ($5,000) and not more than ten thousand dollars ($10,000), as provided by Iowa Code § 685.2(1), to the extent such multiplied penalties shall fairly compensate the State of Iowa or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

O.      That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by Louisiana's medical assistance programs, multiplied as provided for in La. Rev. Stat. Ann. § 46:438.6(B)(2), plus a civil penalty of no more than ten thousand dollars ($10,000) per violation or an amount equal to three times the value of the illegal remuneration, whichever is greater, as provided for by La. Rev. Stat. Ann. § 46:438.6(B)(1), plus up to ten thousand dollars ($10,000) for each false or fraudulent claim, misrepresentation, illegal remuneration, or other prohibited act, as provided by La. Rev. Stat. Ann. § 46:438.6(C)(l)(a), plus payment of interest on the amount of the civil fines imposed pursuant to Subsection B of § 438.6 at the maximum legal rate provided by La. Civil Code Art. 2924 from the date the damage occurred to the date of repayment, as provided by La. Rev. Stat. Ann. § 46:438.6(C)(l)(b), to the extent such multiplied fines and penalties shall fairly compensate the State of Louisiana's medical assistance programs for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after

full discovery;

P.     That judgment be entered in Relator's favor and against Defendants for

restitution to the State of Maryland or its political subdivisions for the value of payments or

benefits provided, directly or indirectly, as a result of Defendants' unlawful acts, as provided for

in Md. Code Ann., Health-Gen. § 2-602(a), multiplied as provided for in Md. Code Ann.,

Health-Gen. § 2-602(b)(1)(ii), plus a civil penalty of not more than ten thousand dollars

($10,000) for each false claim, pursuant to Md. Code Ann., Health-Gen. § 2-602(b)(1)(i), to the

extent such penalties fairly compensate the State of Maryland or its political subdivisions for

losses resulting from the various schemes undertaken by Defendants, together with penalties for

specific claims to be identified at trial after full discovery;

Q.     That judgment be entered in Relator's favor and against Defendants for

restitution to the Commonwealth of Massachusetts or its political subdivisions in the amount of a

civil penalty of not less than five thousand dollars ($5,000) dollars and not more than ten

thousand dollars ($10,000), plus three times the amount of damages, including consequential

damages, sustained by Massachusetts as the result of Defendants' actions, plus the expenses of

the civil action brought to recover such penalties and damages, as provided by Mass. Gen.

Laws ch 12. § 5B, to the extent such penalties shall fairly compensate the Commonwealth of

Massachusetts or its political subdivisions for losses resulting from the various schemes

undertaken by Defendants, together with penalties for specific claims to be identified at trial

after full discovery;

R.     That judgment be entered in Relator's favor and against Defendants for

restitution to the State of Michigan or its political subdivisions for the value of payments or

benefits provided as a result of Defendants' unlawful acts, plus a civil penalty of triple the

amount of damages suffered by Michigan as a result of Defendants' unlawful conduct, as well as not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) per claim, as provided by Mich. Comp. Laws § 400.612(1), as well as the costs incurred by both Michigan and Relator, as provided by §§ 400.610a(9) and 400.610b, in order to fairly compensate the State of Michigan or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

S.        That judgment be entered in Relator's favor and against Defendants for restitution to the State of Minnesota or its political subdivisions for the value of payments or benefits provided as a result of Defendants' unlawful acts, plus a civil penalty of triple the amount of damages suffered by Minnesota as a result of Defendants' unlawful conduct, as well as not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) per claim, as provided by Minn. Stat. § 15C.02(a), as well as the costs incurred by both Michigan and Relator, as provided by Minn. Stat. § 15C.12, in order to fairly compensate Minnesota or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

T.        That judgment be entered in Relator's favor and against Defendants for restitution to the State of Montana or its political subdivisions for the value of payments or benefits provided, directly or indirectly, as a result of Defendants' unlawful acts, as provided for in Mont. Code Ann. § 17-8-403, multiplied as provided for in Mont. Code Ann. § 17-8-403(2), plus a civil penalty of not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) for each false claim, pursuant to Mont. Code Ann. § 17-8-403(2), to the extent

such multiplied penalties shall fairly compensate the State of Montana or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

U.     That judgment be entered in Relator's favor and against Defendants for restitution to the State of Nevada for the value of payments or benefits provided, directly or indirectly, as a result of Defendants' unlawful acts, as provided for in Nev. Rev. Stat. § 357.040, multiplied as provided for in Nev. Rev. Stat. § 357.040(1), plus a civil penalty of not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) for each act, pursuant to Nev. Rev. Stat. § 357.040(1), to the extent such multiplied penalties shall fairly compensate the State of Nevada for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

V.     That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of New Jersey or its political subdivisions multiplied as provided for in N.J. Stat. Ann. § 2A:32C-3, plus a civil penalty of not less than and not more than the civil penalties allowed under the federal False Claims Act (31 U.S.C. § 3729 *et seq.*) for each false or fraudulent claim, to the extent such multiplied penalties shall fairly compensate the State of New Jersey or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

W.     That judgment be entered in Relator's favor and against Defendants for restitution to the State of New Mexico or its political subdivisions for the value of payments or benefits provided, directly or indirectly, as a result of Defendants' unlawful acts, as provided for in N.M. Stat. Ann. § 27-14-4, multiplied as provided for in N.M. Stat. Ann. § 27-14-4, to the

extent such multiplied penalties shall fairly compensate the State of New Mexico or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

   X.  That judgment be entered in Relator's favor and against Defendants for restitution to the State of New York or its political subdivisions for the value of payments or benefits provided, directly or indirectly, as a result of Defendants' unlawful acts, as provided for in N.Y. State Fin. Law § 189(1), multiplied as provided for in N.Y. State Fin. Law § 189(1), plus a civil penalty of not less than six thousand dollars ($6,000) or more than twelve thousand dollars ($12,000) for each false claim, pursuant to N.Y. State Fin. Law § 189(1), to the extent such multiplied penalties shall fairly compensate the State of New York or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

   Y.  That judgment be entered in Relator's favor and against Defendants for restitution to the State of North Carolina for the value of payments or benefits provided, directly or indirectly, as a result of Defendants' unlawful acts, as provided for in N.C. Gen. Stat. § 1-607, multiplied as provided for in N.C. Gen. Stat. § 1-607(a), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) as provided by N.C. Gen. Stat. § 1-607(a), to the extent such multiplied penalties shall fairly compensate the State of North Carolina for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

   Z.  That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of Oklahoma or its political subdivisions

multiplied as provided for in Okla. Stat. tit. 63, § 5053.1(B), plus a civil penalty of not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) as provided by Okla. Stat. tit. 63,

§ 5053.1(B), to the extent such multiplied penalties shall fairly compensate the State of Oklahoma or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

      AA.     That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of Rhode Island or its political subdivisions multiplied as provided for in R.I. Gen. Laws § 9-1.1-3(a), plus a civil penalty of not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) per claim as provided by R.I. Gen. Laws § 9-1,1-3(a), to the extent such multiplied penalties shall fairly compensate the State of Rhode Island or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

      BB.     That judgment be entered in Relator's favor and against Defendants for restitution to the State of Tennessee for the value of payments or benefits provided, directly or indirectly, as a result of Defendants' unlawful acts, as provided for in Tenn. Code Ann. § 71-5-182, multiplied as provided for in Tenn. Code Ann. § 71-5-182(a)(l), plus a civil penalty of not less than five thousand dollars ($5,000) or more than twenty-five thousand dollars ($25,000) pursuant to Tenn. Code Ann. § 71-5-182(a)(l), to the extent such multiplied penalties shall fairly compensate the State of Tennessee for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full

discovery;

CC.     That judgment be entered in Relator's favor and against Defendants for restitution to the State of Texas for the value of payments or benefits provided, directly or indirectly, as a result of Defendants' unlawful acts, as provided for in Tex. Hum. Res. Code Ann. § 36.052(a), multiplied as provided for in Tex. Hum. Res. Code Ann. § 36.052(a)(4), the interest on the value of such payments or benefits at the prejudgment interest rate in effect on the day the payment or benefit was paid or received, for the period from the date the payment or benefit was paid or received to the date that restitution is made to the State of Texas, pursuant to Tex. Hum. Res. Code Ann. § 36.052(a)(2), plus a civil penalty of not less than five thousand dollars ($5,000) or more than fifteen thousand dollars ($15,000) for each unlawful act committed that resulted in injury to an elderly or disabled person, and of not less than one thousand dollars ($1,000) or more than ten thousand dollars ($10,000) for each unlawful act committed that did not result in injury to an elderly or disabled person, pursuant to Tex. Hum. Res. Code Ann. §§ 36.052(a)(3)(A) and (B), to the extent such multiplied penalties shall fairly compensate the State of Texas for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

DD.     That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the Commonwealth of Virginia, multiplied as provided for in Va. Code Ann. § 8.01-216.3(A), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) as provided by Va. Code Ann. § 8.01-216.3(A), to the extent such multiplied penalties shall fairly compensate the Commonwealth of Virginia for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full

**SEALED QUI TAM COMPLAINT – Page 84 of 87**

discovery;

     EE.    That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of Washington or its political subdivisions multiplied as provided for in S. 5978, 62nd Cong. § 202(1), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) and not more than eleven thousand dollars ($11,000) per claim as provided by S. 5978, 62nd Cong. § 202(1), to the extent such penalties shall fairly compensate the State of Washington or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

     FF.    That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of Wisconsin or its political subdivisions multiplied as provided for in Wis. Stat. § 20.931(2), plus a civil penalty of not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) as provided by Wis. Stat. § 20.931(2), to the extent such multiplied penalties shall fairly compensate the State of Wisconsin or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

     GG.    That Defendants be ordered to disgorge all sums by which they have been enriched unjustly by their wrongful conduct;

     HH.    That judgment be granted for Relator against Defendants for all costs, including, but not limited to, court costs, expert fees and all attorneys' fees incurred by Relator in the prosecution of this suit; and

     II.    That Relator be granted such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Relator demands a trial by jury of all issues so triable.

Dated: November 5, 2015

Eric H. Jaso
**Fleming Ruvoldt, PLLC**
250 Moonachie Road
Suite 501
Moonachie, NJ 07074
ejaso@flemingruvoldt.com
*Attorneys for Relator*